UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
GREENBELT DIVISION

-------------------------------------------------------x
:
NANCY E. LEGUM, *pro se*, :
3907 S. Leisure World Blvd. :
Silver Spring, MD 20906, :
:
and :
:
ANTHONY E. KURTZ, *pro se*, :
5931 N. 2nd Street :
Arlington, VA 22203 :
:
             Plaintiffs. :
: Civil Action No. JFM 12 CV 3773
v. :
:
RBC CAPITAL MARKETS, LLC, :       **JURY DEMAND**
SUCCESSOR TO J.B. HANAUER & CO, :
City Place Tower :
525 Okeechobee Blvd., Ste 800 :
West Palm Beach, FL 33401 :
:
and :
:
SAMUEL KLUFT KOLTUN, :
9609 Mockingbird Trail :
Jupiter, FL 33478-6355 :
:
             Defendants. :
:
-------------------------------------------------------x

**COMPLAINT**

COMES NOW Plaintiffs Anthony E. Kurtz ("KURTZ") and Nancy E. Legum

("LEGUM"), each proceeding *pro se*, as and for their Complaint against the Defendants, RBC

Capital Markets. LLC, successor to J.B. Hanauer Co., ("RBC") and Samuel Kluft Koltun

("KOLTUN"), allege and complain as follows:

1

1. This Complaint is a civil action that arises out of Defendants' systematic conversion of LEGUM's inheritance and retirement funds from a conservative, income producing portfolio valued at approximately $750,000 in 2005, into a high-risk more speculative portfolio that, by early 2010 had lost more than half of its original value.

2. The Complaint also arises out of Defendants' misrepresentations and omissions to KURTZ regarding the safety of his investment portfolio that had an initial value of $25,000 in late 2006 and, by late 2009 had lost more than half of its original value.

3. This action is brought pursuant to the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §1961 et seq. ("RICO"); Fraudulent Interstate Transactions, 15 U.S.C. § 77Q; Prohibited Transactions by Investment Advisers, 15 U.S.C. § 80B-6 (4); and, in part, under the Investment Advisors Act of 1940, 15 U.S.C. § 80B-14.

4. Plaintiffs seek to recover the substantial losses caused by Defendants' violation of the civil RICO statute, as well as breaches of duty, misrepresentations and omissions, and violations of state and federal law, through their blatant disregard of Plaintiffs' stated investment objectives, financial condition and needs, and through the pursuit of an investment strategy that was clearly unsuited for Plaintiffs. Plaintiffs also seek the return of the significant fees that were paid to Defendants as compensation for their patently improper advisory services.

## THE PARTIES

5. Plaintiff LEGUM is a citizen of Maryland, residing at 3607 S. Leisure World Blvd., Silver Spring, MD 20906.

6. Plaintiff KURTZ is a citizen of Virginia, residing at 5931 N. 2nd Street, Arlington, VA 22203.

7. Defendant RBC is a registered investment adviser with offices at City Place Tower, 525 Okeechobee Blvd., Ste 800, West Palm Beach, FL 33401. Upon information and belief, RBC is the successor entity to J.B. Hanauer & Co.

8. Defendant KOLTUN is a citizen of Florida, residing at 9609 Mockingbird Trail, Jupiter, FL 33478-6355. Upon information and belief, KOLTUN is a financial adviser with RBC who operates from RBC's West Palm Beach, Florida offices.

## JURISDICTION AND VENUE

9. Plaintiffs allege violations of 18 U.S.C. §1961 et seq., underlying violations of 18 U.S.C. § 1343; 15 U.S.C. § 77Q, Fraudulent Interstate Transactions; 15 U.S.C. § 80B-6 (4), Prohibited Transactions by Investment Advisers; and, in part, 15 U.S.C. § 80B-14, the Investment Advisors Act of 1940.. As such, this Court has jurisdiction pursuant to the above enumerated federal statutes, 18 U.S.C. §1964(c) (civil RICO); 28 U.S.C. § 1331 (federal question); and 28 U.S.C. § 1332 (a)(1) (diversity of citizenship and amount of controversy in excess of $75,000).

10. Venue is proper in this district pursuant to 28 U.S.C. § 1391 (b)(2), since substantially all of the acts and omissions at issue in this action took place within this jurisdiction.

## STATEMENT OF FACTS

11. On or about 1995 Plaintiff LEGUM was first introduced to Defendant KOLTUN, who was, at that time, a financial advisor with J.B. Hanauer & Co. KOLTON was a financial advisor to LEGUM's father, David H. Legum.

12. LEGUM's father had decided to gift approximately $100,000 in municipal bonds to his daughter and, in so doing, established a separate brokerage account for her at J.B. Hanauer & Co. KOLTUN was designated as LEGIM's financial advisor at that time.

13. In October 2003, LEGUM's father died and her share of the estate, after payment of federal estate taxes and administrative fees, was approximately $700,000. Between late October 2003 and early 2005, disbursements totaling that amount were made by the estate attorney directly into LEGUM's brokerage account.

14. By early 2005, LEGUM's brokerage account balance with J.B. Hanauer & Co. was, after deduction of $220,000 for the purchase of LEGUM's principal residence, approximately $650,000.

15. From the outset of her relationship with KOLTUN, LEGUM explained that she wanted her investments handled by an adviser she could trust to ensure that she could achieve her investment goals of producing sufficient annual income to sustain herself through the balance of her lifetime.

16. LEGUM had been a real estate agent for a number of years, earning only modest annual commissions. But, by 2005 she had become seriously ill with polymyositis, fibromyalgia, Reynaud's syndrome, as well as numerous related medical complications, including congestive heart failure, making it impossible for her to work again.

17. Consequently, LEGUM had no other sources of income, aside from limited Social Security benefits, and required the income from the estate to support her, maintain her home, and cover her medical expenses in a manner designed to permit her to live comfortably.

18. LEGUM repeatedly explained her situation to KOLTUN and asked that her investments be in the "low risk" category because she had always been told by her father that "bonds are the best investment."

19. When LEGUM received her share of her father's estate, the holdings in the portfolio were primarily municipal bonds. KOLTUN advised LEGUM that she was "too young" for such

a portfolio and that "bonds are for much older people – like your father" and that there would be "no growth" if the portfolio were maintained as it was at the time of LEGUM's father's death.

20. LEGUM was a completely unsophisticated investor who, at age 62, had never maintained any brokerage account, had no financial management experience, and had relied entirely upon her father to handle her financial affairs.

21. Given LEGUM's lack of experience and concerns about the safety of her investments, on several occasions, she made inquiries of KOLTUN regarding the nature of the securities in which he had decided to invest her assets. On more than one occasion, LEGUM telephonically expressed her specific concern that KOLTUN *not* invest in "high risk" stocks or funds, or other volatile and risky securities.

22. Notwithstanding established brokerage practice, KOLTUN consistently failed to consult LEGUM regarding the investment of her assets; rather, KOLTUN arbitrarily determined what sales and purchases would occur and informed LEGUM that those transactions would take place.

23. In June 2004 KOLTUN bought $45,000 of preferred General Motors stock, a $50,000 General Motors Acceptance Corporation bond, and $50,000 of Ford Motor Co, bonds. At that time, LEGUM also had another $50,000 General Motors bond in her portfolio.

24. In 2009 KOLTUN sold one of the General Motors bonds. When LEGUM questioned KOLTUN as to why he had not sold all of her General Motors holdings, KOLTUN replied "you are OK with what you have left." After the Chapter 11 bankruptcy filing by General Motors, LEGUM's General Motors holdings were worthless.

25. In 2009 KOLTUN sold the Ford Motor Co. bonds, in anticipation of the government "auto bailout;" notwithstanding that Ford did not participate in the bailout and just prior to a highly favorable quarterly earnings report by Ford.

26.     KOLTUN knew, or should have known, that his "strategy" would result in significant losses for LEGUM. Whenever LEGUM attempted to question KOLTUN as to whether the investments he was making were suitable for her investment goals and objectives, KOLTUN forcefully responded that he knew best, that he would "take care" of her investments, " didn't your father tell you to always do what I say,?""I know what I'm doing," and "let me worry, that's what you pay me for." Having questioned KOLTUN's wisdom and been rebuked by his strong and intimidating tone, LEGUM's contacts with him became less frequent and she was, necessarily, even less informed about, or involved with, the nature of her investments.

27.     In late August 2009, KOLTUN sold securities that were originally purchased for approximately $182,000 in order to purchase $127,000 of a John Hancock Fund, thus guaranteeing LEGUM a loss of $55,000. The theory expressed by KOLTUN was that the Hancock investment would rapidly appreciate and LEGUM would recover her loss.

28.     In actuality, that Hancock fund was then rated by Morningstar as a "1 star" investment - the lowest possible rating – and was regarded as "high risk;" this was the antithesis of LEGUM's wishes. Had the subject shares not been sold to purchase the Hancock fund, history established that they would have recaptured their original value within a year.

29.     In December 2009, KURTZ, who is LEGUM's son, had one of several telephone conversations with KOLTUN where he discussed both his mother's and his own portfolios. At that time, KURTZ explained to KOLTUN that his mother did not understand that an attempt to create higher yield meant exposing her to greater risk.  KURTZ cautioned KOLTUN that he was either not telling his mother of the risk to her capital, or failing to communicate the risk properly. KOLTUN's dismissive reply was as follows: "Do you think your mother is capable of making a

responsible decision? ... I'm asking." The question shows that KOLTUN clearly believed LEGUM was incapable of doing so.

30. In the event, due to KOLTUN's high-handed approach and arbitrary decision-making, by early 2010, LEGUM's portfolio value had decreased to $274,500 and LEGUM ended her relationship with KOLTUN and RBC.

31. In late 2006, KURTZ had accumulated some money that he wanted to invest. Since KOLTUN had been the "family financial advisor" for a number of years and had been recommended by his mother and uncle, KURTZ approached him for investment advice.

32. KURTZ, at the time 43 years of age, initially explained to KOLTUN that he had worked hard as a courier for many years and that the $25,000 he had to invest was just as critical to him as his mother's investments were to her. KURTZ told KOLTUN that this was his first foray into the world of investments, that he was not knowledgeable about investing, and that he was looking to KOLTUN for safe investment advice.

33. KURTZ carefully explained several times to KOLTUN that his goal was to double the value of his $25,000 investment by February 1, 2015; the date that KURTZ's home mortgage would be paid off and he could semi-retire. He expressed his wishes that any investments he made should be in the "low risk" category and so indicated on RBC's Client Information Form.

34. In response to KURTZ's stated investment objectives, KOLTUN strongly recommended the initial purchase of a $15,000 position in a Russell Investments fund and a subsequent $10,000 position in a Henderson fund.

35. The rationale expressed by KOLTUN for the Russell purchase was that "if the market goes South, this investment will be protected from losses and downturns better than most investments." "This is the fund of funds."

36.     Insofar as the investment in the Henderson fund is concerned, KOLTUN explained that it was "slightly more risky" than the Russell fund, but "still a sound investment." In fact, the Henderson fund investment, centered on Asian markets, was a disastrous choice; the fund losing an appreciable part of its value shortly after KOLTUN made the purchase for KURTZ.

37.     By 2009, Kurtz's portfolio had plunged to a value of $13,000 – approximately half its original value and twice the loss of the national average at that time – and he soon thereafter terminated his relationship with KOLTUN and RBC.

38.     Had KOLTUN properly understood KURTZ's investment goals and objectives, he could – and –should – have recommended that KURTZ invest his $25,000 in a ten-year annuity that would have virtually guaranteed the doubling of his principal by the desired date of February 1, 2015.

## 18 U.S.C § 1964 STATUTE OF LIMITATIONS

39.     It is generally the case that a claim accrues in a federal action as soon as a potential claimant either is aware, or should be aware, of the existence and source of injury. *See, United States v. Kubrick*, 444 U.S. 111 (1979); *Chalabi v. Hashemite Kingdom of Jordan*, 543 F.3d 725 (D.C.Cir. 2008) (acknowledging four-year period for civil RICO); *accord, Detrick v. Panalpina, Inc*, 108 F.3d 529 (4th Cir. 1997) (same).

40.     Since Plaintiffs discovered the RICO violations in late 2009, this Complaint is well within the permissible time-frame and the issues are ripe for adjudication.

## COUNT I – VIOLATIONS OF 18 U.S.C §§ 1962 (c) & 1962 (d)

41.     Plaintiffs re-allege the content of paragraphs 1 through 38 above as if fully set forth herein.

42.     Plaintiffs LEGUM and KURTZ are each a "person" as defined in 18 U.S.C. § 1961(3).

43.     Defendant RBC, is a "person" as defined in 18 U.S.C. §§ 1961(3) and 1962(c).

44.     Defendant KOLTUN, is a "person" as defined in 18 U.S.C. §§ 1961(3) and 1962(c).

45.     RBC is an "Enterprise" within the meaning of 18 U.S.C. §§ 1961(4) and 1962(c).

46.     Defendant KOLTUN was associated with the Enterprise and participated directly and/or indirectly in the conduct of the Enterprise's activities and affairs through a pattern of racketeering activity; to wit, violations of 18 U.S.C. §1343 (wire fraud) by devising or intending to devise a scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises and transmitted or caused to be transmitted by means of wire, radio, or television communication in interstate commerce, writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice.

47.     Plaintiffs have suffered injury to their property within the meaning of 18 U.S.C. § 1964(c) and, due to RBC and KOLTUN's violations of 18 U.S.C. § 1962(c) and (d), are entitled to recover threefold the damages they sustained and the cost of the suit, including a reasonable attorney's fee, in an amount to be determined at trial, but not less than $735,000 as to LEGUM and $111,000 as to KURTZ.

### COUNT II – VIOLATION OF 15 U.S.C. § 77Q
### FRAUDULENT INTERSTATE TRANSACTIONS

48.     Plaintiffs re-allege the content of paragraphs 1 through 45 above as if fully set forth herein.

49.     RBC and KOLTUN employed a device, scheme, or artifice and obtained money from LEGUM and KURTZ by means of untrue statements of a material fact, omissions to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, and engaged in a transaction, practice, or course of

9

business that operated as a fraud or deceit upon LEGUM and KURTZ; all in violation of 15 U.S.C. § 77Q (a).

50. RBC and KOLTUN used interstate commerce for the purpose of facilitating an offering for sale in violation of 15 U.S.C. § 77Q (b).

51. As a direct an proximate result of RBC and KOLTUN's fraudulent interstate transactions, Plaintiffs have been damaged in an amount to be determined at trial, but not less than $245,000 as to LEGUM and $37,000 as to KURTZ.

### COUNT III – VIOLATIONS OF 15 U.S.C. § 80B-6
### PROHIBITED TRANSACTION BY INVESTMENT ADVISORS

52. Plaintiffs re-allege the content of paragraphs 1 through 49 above as if fully set forth herein.

53. RBC and KOLTUN employed the use of the mails or other means of interstate commerce to directly employed a device, scheme, or artifice to defraud LEGUM and KURTZ and engaged in a transaction, practice, or course of business that operated as a fraud or deceit upon LEGUM and KURTZ; all in violation of 15 U.S.C. § 80B-6.

54. As a direct an proximate result of RBC and KOLTUN's prohibited transactions by investment advisers, Plaintiffs have been damaged in an amount to be determined at trial, but not less than $245,000 as to LEGUM and $37,000 as to KURTZ.

### COUNT IV – BREACH OF FIDUCIARY DUTY

55. Plaintiffs re-allege the content of paragraphs 1 through 52 above as if fully set forth herein.

56. At all relevant times, RBC and KOLTUN held themselves out to Plaintiffs to be experienced investment and financial advisers, competent to render reliable investment advice consistent with Plaintiffs' stated needs and objectives. Defendants intended and knew that

LEGUM and KURTZ were relying upon Defendants to use that degree of care and to have that degree of competence normally expected of financial advisers.

57. RBC and KOLTUN owed LEGUM and KURTZ the fiduciary duties of reasonable care, utmost good faith, integrity, and loyalty.

58. RBC and KOLTUN were under a duty to protect LEGUM and KURTZ's interests through the exercise of such skill, prudence, diligence and judgment as might be reasonably expected of an experienced financial adviser.

59. RBC and KOLTUN also owed LEGUM and KURTZ the duty to disclose all material facts within Defendants' knowledge that in any way affected any of the investments made involving LEGUM and KURTZ's assets, and to explain to Plaintiffs the practical impact and potential risks of the investments, investment programs, and overall course of dealing in which RBC and KOLTUN were engaged.

60. RBC and KOLTUN also were under a duty not to recommend, or pursue investments in, securities that were unsuitable for LEGUM and KURTZ in light of their respective financial situations, needs and investment objectives – all of which both LEGUM and KURTZ understood to be – at a minimum – to preserve their capital and, in LEGUM's case, to generate a reasonable income and enable her to maintain a modest standard of living and pay for her medical expenses.

61. RBC and KOLTUN breached their fiduciary duties to LEGUM and KURTZ by, among other things, disregarding both Plaintiffs' stated investment objectives and financial needs, failing to exercise requisite care in selecting investments for LEGUM and KURTZ's assets; failing to invest their assets in stable, secure, securities, and instead investing LEGUM and KURTZ's assets in "high risk" funds; failing to disclose all material facts concerning investment

decision to Plaintiffs; failing to inform Plaintiffs of the risks associated with such investments; and falsely assuring them that such investments were not risky or speculative.

62. As a direct and proximate result of RBC and KOLTUN's breaches of fiduciary duty, Plaintiffs have been damaged in an amount to be determined at trial, but not less than $245,000 as to LEGUM and $37,000 as to KURTZ.

63. In addition, RBC and KOLTUN's disregard of both Plaintiffs stated needs and objectives, as well as LEGUM's most grave health problems, was extreme outrageous, wanton and willful, exposing both Plaintiffs to serious, ruinous, financial depletion and exposing LEGUM to aggravation of her medical condition due to the stress suffered as a result of Defendants' actions. Accordingly, Plaintiffs should be entitled to an award of punitive damages in an amount to be determined at trial, but not less that $2 million.

## COUNT V – NEGLIGENCE

64. Plaintiffs re-allege the content of paragraphs 1 through 61 above as if fully set forth herein.

65. RBC and KOLTUN's recommendation and pursuit of the investment strategy set out above also constituted negligence since their investment of Plaintiffs' assets in high-risk, speculative growth, funds constituted an investment program that was perversely unsuited for both LEGUM and KURTZ in view of their stated and, to Defendants known, financial needs and investment objectives.

66. As a direct an proximate result of RBC and KOLTUN's negligence, Plaintiffs have been damaged in an amount to be determined at trial, but not less than $245,000 as to LEGUM and $37,000 as to KURTZ.

## COUNT VI – BREACH OF CONTRACT

67. Plaintiffs re-allege the content of paragraphs 1 through 64 above as if fully set forth herein.

68. As a routine matter, financial advisors enter into an agreement with their clients that has an express provision that assets will only be invested after discussing the suitability of such investments with the client (a Client Agreement).

69. Upon information and belief, notwithstanding industry practice, RBC and KOLTUN failed to furnish such an agreement to LEGUM and KURTZ. Plaintiffs assert that such an agreement implicitly existed and Defendants were bound to obtain Plaintiffs' agreement to any sales or purchases made on their behalf.

70. As set out above, RBC and KOLTUN failed to discuss the suitability of most of the investments made for LEGUM and KURTZ and/or alternatively misrepresented the suitability (or lack thereof) of these investments to Plaintiffs.

71. Accordingly, Defendants breached the implicit Client Agreement.

72. As a direct an proximate result of RBC and KOLTUN's breach of contract, Plaintiffs have been damaged in an amount to be determined at trial, but not less than $245,000 as to LEGUM and $37,000 as to KURTZ.

## COUNT VII – NEGLIGENT MISREPRESENTATION

73. Plaintiffs re-allege the content of paragraphs 1 through 70 above as if fully set forth herein.

74. RBC and KOLTUN owed Plaintiffs the fiduciary duties of care, good faith, loyalty, and candor and therefore owed Plaintiffs a duty of care to communicate truthful information.

75. RBC and KOLTUN made false representations, misrepresentations, or omitted to disclose material facts to Plaintiffs regarding the suitability, and risks associated with, each investment of Plaintiffs' assets and thus breached their duty of care to communicate truthful information to the Plaintiffs.

76. RBC and KOLTUN made such false representations, misrepresentation, or omissions with knowledge of the truth, and with the intent and knowledge that Plaintiffs would rely on those false representation, misrepresentations, or omissions.

77. LEGUM and KURTZ justifiably relied on RBC and KOLTUN's representations and assurances in deciding to entrust their assets to Defendants' management and in deciding to engage and maintain Defendants as their financial advisor.

78. Had RBC and KOLTUN told Plaintiffs the truth concerning their investment strategies and the risks associated with each investment, Plaintiffs would not have engaged Defendants or would not have continued to entrust their assets to Defendants care and management.

79. As a direct an proximate result of RBC and KOLTUN's misrepresentations and omissions, Plaintiffs have been damaged in an amount to be determined at trial, but not less than $245,000 as to LEGUM and $37,000 as to KURTZ.

## COUNT VIII – CONSTRUCTIVE FRAUD

80. Plaintiffs re-allege the content of paragraphs 1 through 77 above as if fully set forth herein.

81. RBC and KOLTUN made false representation to Plaintiffs concerning the suitability, and risks associated with, each investment of Plaintiffs assets.

82. RBC and KOLTUN made such representations with either knowledge of their falsity or reckless disregard of their truth or falsity.

83. RBC and KOLTUN intended the Plaintiffs to act upon such representations.

84. LEGUM and KURTZ were ignorant of the falsity of Defendants' representations and rightfully relied upon the truth of Defendants' representation because of the fiduciary relationship between Defendants and Plaintiffs.

85. As a direct an proximate result of RBC and KOLTUN's misrepresentations and omissions, Plaintiffs have been damaged in an amount to be determined at trial, but not less than $245,000 as to LEGUM and $37,000 as to KURTZ.

### COUNT IX – RESTITUTION FOR VIOLATION OF THE INVESTMENT ADVISERS ACT OF 1940

86. Plaintiffs re-allege the content of paragraphs 1 through 83 above as if fully set forth herein.

87. As alleged herein, RBC and KOLTUN engaged in deceptive acts and practices in misrepresenting and/or omitting to disclose the truth concerning the risks associated with the investments they pursued on behalf of Plaintiffs, and in falsely assuring Plaintiffs that such investments were not risky or speculative.

88. RBC and KOLTUN's acts and omissions violated Section 206 of the Investment Advisers Act of 1940, 15 U.S.C. § 80B-6, rendering any Client Agreement null and void.

89. LEGUM and KURTZ are entitled to restitution of all fees paid to RBC and KOLTUN pursuant to any Client Agreement or other applicable Schedule of Fees in an amount to be determined at trial

**WHEREFORE**, for the foregoing reasons, Plaintiffs respectfully pray for judgment as follows:

(a) As to Count I, violations of 18 U.S.C. §1962(c); 18 U.S.C. §1964(c), and the underlying violations of 18 U.S.C. §§1341 & 1343, named therein, an award of three times the Plaintiffs'

damages, in an amount to be determined at trial, but not less than $840,000 as to LEGUM and $111,000 as to KURTZ, plus an award of punitive damages of at least $2 million;

(b) As to Count II (Violation of 15 U.S.C. § 77Q (b) - Fraudulent Interstate Transactions); Count III (Violation of 15 U.S.C. § 80B-6- Prohibited Transactions by Investment Advisers); Count IV (Breach of Fiduciary Duty); Count V (Negligence); Count VI (Breach of Contract); Count VII ( Negligent Misrepresentation); Count VIII (Constructive Fraud); and Count IX (Violation of the Investment Advisers Act of 1940), an award on each Count, II through VIII inclusively, of damages in an amount to be determined at trial, but not less than $245,000 as to LEGUM and $37,000 as to KURTZ and the return to Plaintiffs of all brokerage fees paid to Defendants in an amount to be determined at trial.

(c) An award to Plaintiffs for their costs, expenses, and related costs of investigation pursuant to 18 U.S.C. § 1964(c).

(d) Such other relief that the Court deems just and proper.

## JURY DEMAND

Plaintiffs hereby demand a trial by jury as to all issues in this Complaint.

Date:   December 26, 2012

_____
NANCY E. LEGUM, *pro se*,
3607 South Leisure World Blvd.
Silver Spring, MD 20906
(301) 598-4433

Date:   December 26, 2012

_____
ANTHONY E. KURTZ, *pro se*
5931 N. 2nd Street
Arlington, VA 22203
(703) 431-9438